IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

ROBERT WASHBURN,                    )
                                    )
                Plaintiff,          )        Civil Case No. 07-766-KI
                                    )
        vs.                         )        OPINION AND ORDER
                                    )
MICHAEL J. ASTRUE,                  )
COMMISSIONER of Social Security,    )
                                    )
                Defendant.          )
_____)

        Tim Wilborn
        Wilborn Law Office, P.C.
        19093 S. Beavercreek Road, PMB #314
        Oregon City, Oregon  97045

                Attorney for Plaintiff

        Karin J. Immergut
        United States Attorney
        District of Oregon
        Britannia I. Hobbs
        Assistant United States Attorney
        1000 S. W. Third Avenue, Suite 600
        Portland, Oregon  97204-2902

David M. Blume
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 5th Avenue, Suite 2900 M/S 901
Seattle, Washington  98104-7075

      Attorneys for Defendant


KING, Judge:

Plaintiff Robert Washburn brings this action pursuant to section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner denying plaintiff's application for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI").  I reverse the decision of the Commissioner.

## BACKGROUND

Washburn filed applications for DIB and SSI with protected filing dates of June 15 and October 12, 2000, alleging an onset date of May 14, 1999.  The applications were denied initially and upon reconsideration.  After a timely request for a hearing, Washburn, represented by a lay advocate, appeared and testified before an Administrative Law Judge ("ALJ") on November 16, 2005.

On August 17, 2006, the ALJ issued a decision finding that Washburn was not disabled within the meaning of the Act and therefore not entitled to benefits.  This decision became the final decision of the Commissioner when the Appeals Council declined to review the decision of the ALJ.

## LEGAL STANDARDS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The claimant has the burden of proof on the first four steps. Bustamante v. Massanari, 262 F.3d 949, 953 (9th Cir. 2001); 20 C.F.R. §§ 404.1520 and 416.920. First, the Commissioner determines whether the claimant is engaged in "substantial gainful activity." If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the Commissioner proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to

do basic work activities."  20 C.F.R. §§ 404.1520(c) and 416.920(c).  If the claimant does not

have a severe impairment or combination of impairments, disability benefits are denied.

     If the impairment is severe, the Commissioner proceeds to the third step to determine

whether the impairment is equivalent to one of a number of listed impairments that the

Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R.

§§ 404.1520(d) and 416.920(d).  If the impairment meets or equals one of the listed impairments,

the claimant is conclusively presumed to be disabled.  If the impairment is not one that is

presumed to be disabling, the Commissioner proceeds to the fourth step to determine whether the

impairment prevents the claimant from performing work which the claimant performed in the

past.  If the claimant is able to perform work which he or she performed in the past, a finding of

"not disabled" is made and disability benefits are denied.  20 C.F.R. §§ 404.1520(e) and

416.920(e).

     If the claimant is unable to perform work performed in the past, the Commissioner

proceeds to the fifth and final step to determine if the claimant can perform other work in the

national economy in light of his or her age, education, and work experience.  The burden shifts to

the Commissioner to show what gainful work activities are within the claimant's capabilities.

Bustamante, 262 F.3d at 954.  The claimant is entitled to disability benefits only if he is not able

to perform other work.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

     The court must affirm a denial of benefits if the denial is supported by substantial

evidence and is based on correct legal standards.  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir.

1998).  Substantial evidence is such relevant evidence as a reasonable person might accept as

adequate to support a conclusion.  It is more than a scintilla, but less than a preponderance, of the evidence.  Id.

Even if the Commissioner's decision is supported by substantial evidence, it must be set aside if the proper legal standards were not applied in weighing the evidence and in making the decision.  Id.  The court must weigh both the evidence that supports and detracts from the Commissioner's decision.  Id.  The trier of fact, and not the reviewing court, must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the Commissioner.  Id. at 720-21.

## FACTS

I.    Washburn's History

Washburn, who was 42 at the time of alleged disability onset, and 49 at the time of the ALJ's decision, had previously obtained his GED.  He last worked as a gas station attendant in May 1999, but the record reflects he may have done some work up to May 2000.

Before his onset date, Washburn had complained of abdominal pain, back pain, and chest pain, and had received an abdominal CT scan, thoracic spine x-rays, a renal ultrasound, and a stress echocardiogram, all of which were normal.  Richard Cade, M.D., noted that plaintiff had seen many doctors and chiropractors, and had been evaluated multiple times, without success.

On May 23, 1999, his alleged onset date, Washburn went to the emergency room complaining of chest and neck pain.  He said he had fallen at the gas station eight days before. X-rays revealed atypical positioning of the cervical spine, but no acute bone injury and little degenerative change.  An MRI of the cervical spine showed a small defect at C4-5.  An MRI of the lumbar spine shows minor spondylosis changes at L3-4 and, to a lesser degree, changes at L4-

5. A thoracic spine MRI was normal in December 1999. A left shoulder MRI in December 1999 showed a mild degree of left shoulder impingement and mild rotator cuff tendinopathy, and no rotator cuff tears.

Dr. Cade recommended plaintiff not work until January 20, 2000, due to stiffness from the mild degenerative changes, but could not keep him off work longer than that. He told plaintiff surgery was not warranted. In February, Dr. Cade again told plaintiff he did not see a reason for plaintiff to stay home from work.

Washburn saw Ivan Eastwood, M.D., for a colonoscopy on January 25, 2000, which showed a probable adenomatous polyp and some hemorrhoids. Dr. Eastwood noted that plaintiff was "fantastically anxious." Tr. 325.

In February 2000, plaintiff saw N.H. Maloney, M.D., for pain management; he reported neck and upper back pain and two to three headaches a week. Dr. Maloney diagnosed plaintiff with a bilateral upper trapezius strain and a strain to the left shoulder girdle.

In March 2000, plaintiff complained about abdominal pain, but the abdominal ultrasound in April 2000 showed only a mildly enlarged liver, most likely due to fatty infiltration.

In May 2000, plaintiff went to the urgent care center complaining he had stubbed his right foot working at a gas station. A right foot x-ray revealed a possible hairline fracture at the base of his fifth toe. S. Tuft, M.D., cleared plaintiff for work.

Dr. Cade told plaintiff in May of 2000 that his workers' compensation benefits had ceased. Dr. Cade told plaintiff that he could see another neurosurgeon, but reminded him that every study had been normal. Dr. Cade stopped extending plaintiff's work release and his workers' compensation disability.

Cathleen Farris, M.D., a neurosurgeon, examined plaintiff in February 2000, and opined that plaintiff suffered from a psychosocial or psychiatric condition such as somatoform personality disorder, conversion reaction, manifestation of anxiety/depression, or possible malingering. Dr. Farris thought such a diagnosis was the only way to explain plaintiff's symptoms.

In April 2000, neurosurgeon William Parsons, M.D., and orthopedist Steven Schilperort, M.D., examined plaintiff. They found he could return to work. They noted that plaintiff was tan and had likely been involved in some activity requiring heavy right upper extremity use given the fact that his upper right arm was 2 cm larger than his left, and his right forearm was 1.5 cm larger than his left.

In July 2000, plaintiff complained of problems drifting off to the left side while walking and difficulty arousing, as well as periods of feeling paralyzed and being unable to speak. A head CT showed a "tiny suggestion" in the right temporal area of different density, but Lynn McDonald, M.D., described the finding as an "extremely soft finding," which could be an old trauma.

Plaintiff made a visit to the emergency room in August 2000 for chest pain, which was deemed gastrointestinal reflux.

William Trueblood, Ph.D., diagnosed plaintiff with an adjustment disorder as well as avoidant or schizoid personality characteristic, and assessed him provisionally with a

somatoform disorder and panic disorder. He rated plaintiff's Global Assessment of Functioning (GAF) at 57.[1]

Plaintiff visited the emergency room again in December 2000 for rectal bleeding during stools. He complained of abdominal pain that radiated to his low back, groin and testicles. He had tooth pain, but had not seen a dentist. The exam was largely normal. Kim Friedman, M.D., suggested that his symptoms could be a function of depression and suggested increasing plaintiff's Zoloft.

In March of 2001, plaintiff saw Michael Harris, M.D., who found 11 out of 18 positive fibromyalgia trigger points. Dr. Harris opined that plaintiff had probable fibromyalgia/myofascial pain syndrome, and recommended regular exercise and stress management. A little over a month later, Dr. Harris gave the assessment of left-sided myofascial pain of undetermined etiology, with a marked anxiety component. He referred plaintiff to the Medical Symptom Reduction program for anxiety, panic disorder, hypertension, hyperlipidemia, fatigue and depression.

In late March 2001, plaintiff went back to the emergency room complaining of abdominal pain, diarrhea, pain in his left thigh and bilateral testicular pain. His exam was largely normal. He complained of tenderness in his abdomen, but when his attention was diverted his guarding was diminished or absent.

---

[1]A GAF score between 51 and 60 indicates that an individual has "[m]oderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or coworkers)." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) (DSM-IV).

A brain MRI on May 16, 2001 was normal, as was an MR angiography of the neck and intracranial vasculature.

On May 30, 2001, plaintiff complained to neurologist Stephen Ireland, M.D., that he had intermittent double vision, facial weakness, spinning, difficulty reading, staring spells, temporary loss of muscle tone, strange perceptions, difficulty swallowing, trouble with balance, neck pain, upper back pain, low back pain, radiating leg and arm pain, stool incontinence, fever, chills, sweats, cough, shortness of breath, wheezing, chest pain, palpitations, bloody stools, and stiff, swollen, and painful joints.  Plaintiff's exam was largely normal, although he had some weakness on the left side and a positive Hoover's sign[2] on the left side.  Dr. Ireland noted that the cause of plaintiff's "myriad complaints" was not clear, but he did not think further neurologic evaluation was necessary.  Tr. 346.

Plaintiff had his gallbladder removed in January 2002.  Pathology tests on the gallbladder were normal.

In April 2002, Jeffrey Absalon, M.D., evaluated plaintiff for his chronic diarrhea.  Dr. Absalon diagnosed plaintiff with hypertriglyceridemia, chronic diarrhea with chronic abdominal pain and blood in his stool, reflux esophagitis, and elevated liver enzymes.  He recommended a proton pump inhibitor and hepatis serology.

Tests throughout the remainder of 2002 and the beginning of 2003 consistently showed largely normal results.

---

[2]"Hoover's sign:  An indication of compensatory movement in legs in which a supine individual, when asked to raise one leg, involuntarily exerts counterpressure with the heel of the opposite leg even if that leg is paralyzed, or if the individual attempts to lift a paralyzed leg, counterpressure is made with the heel of the other leg."  http://medical-dictionary.thefreedictionary.com

Plaintiff saw Dr. Cade in June 2003.  Plaintiff's exam was normal.  Dr. Cade diagnosed plaintiff with suspected peripheral neuropathy, fibromyalgia,  hypertension, and lipid problems.

Dr. Cade referred plaintiff to David Sandoval, M.D., and plaintiff saw him in June 2003. Dr. Sandoval noted all fibromyalgia spots were positive, but he wanted to rule out inflammatory arthropathy.  Dr. Sandoval subsequently noted that plaintiff probably had fibromyalgia, but wanted to repeat testing in three to six months to rule out other causes of plaintiff's symptoms. Dr. Sandoval obtained cervical spine x-rays in October 2003, and noted unchanged mild right side issues with development of C5-6 moderately severe spondylosis and uncovertebral arthrosis with right more than left acquired bony foraminal stenosis.

A December 2003 visit to the emergency room for flank pain, right lower back pain and right leg pain revealed largely normal test results.

In February 2004, Dr. Sandoval diagnosed osteoarthritis of the cervical spine.  In July 2004, Dr. Sandoval again diagnosed osteoarthritis of the cervical spine, and did not mention fibromyalgia.

In July 2004, Delmar Greenleaf, M.D., performed a consultative exam on plaintiff.  He found that plaintiff could dress and undress himself and get on and off the exam table without problems.  He had leukoplakia under his lower lip from chewing tobacco.  Dr. Greenleaf noted that all 18 classic tender points for fibromyalgia were firmly palpated and virtually none were reported as tender.  This was done with both distraction and focused questioning.  Dr. Greenleaf did note some pain on the spine, on the left more than the right.  Dr. Greenleaf noted plaintiff was not giving all his effort to the range of motion testing.  Plaintiff's neurological exam was normal.  Dr. Greenleaf's assessment was that plaintiff had a history of pain before and after his

1999 on-the-job injury, that plaintiff exaggerated his symptoms consistent with an element of malingering.  He did note the mild degenerative changes in plaintiff's neck and low back, but opined that they did not explain the severity of his pain.  He did find plaintiff had somatoform disorder and left shoulder pain consistent with supraspinatous tendonitis.  He thought plaintiff could stand, walk and sit for two hours at a time, and could sit for six hours in an eight-hour day.  He thought claimant could do light physical work for eight hours a day with normal breaks.  He identified some postural and environmental limits.

Dr. Sandoval declined to fill out disability forms for plaintiff in February 2005.

II.      The ALJ's Decision

The ALJ concluded that Washburn suffers from degenerative disc disease of the lumbar and cervical spine, left shoulder tendonitis, somatoform disorder, and adjustment disorder. However, the ALJ did not find that these impairments met or medically equaled the requirements of any impairments listed in Appendix 1, Subpart P of the Social Security Regulations.  In addition, the ALJ concluded plaintiff's fibromyalgia is not a severe impairment.

The ALJ opined that Washburn has the residual functional capacity to lift 20 pounds occasionally and ten pounds frequently, that he can stand or walk for up to two hours in an eight-hour day, and can sit for six hours in an eight-hour day if he changes positions every 30 minutes. Washburn can occasionally push or pull with his lower and upper extremities, but cannot climb or balance.  Washburn can occasionally stoop, kneel, crouch and crawl.  He should avoid concentrated exposure to extreme heat or cold, hazards, fumes, dusts, gases and odors.  He can have occasional contact with the general public, and can perform simple, routine tasks with simple instructions.

Based on this residual functional capacity, and the testimony of the vocational expert ("VE"), the ALJ concluded that Washburn cannot perform his past work, but can perform work as a small products assembler, marking clerk, and automatic film developer.

## DISCUSSION

I.    <u>Whether Fibromyalgia is a "Severe" Impairment</u>

Plaintiff argues the ALJ erred in failing to find plaintiff's fibromyalgia to be a severe impairment.

The threshold at step two is a low one.  It is a "de minimis screening device [used] to dispose of groundless claims."  <u>Webb v. Barnhart</u>, 433 F.3d 683, 687 (9th Cir. 2005) (internal quotation omitted).  An impairment is not severe "if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1521(a), 416.921(a).

Fibromyalgia was first identified as a possible cause of plaintiff's pain in March of 2001. Dr. Harris found 11 out of 18 positive fibromyalgia trigger points and opined that plaintiff had probable fibromyalgia/myofascial pain syndrome.  A little over a month later, Dr. Harris saw plaintiff for a follow-up visit, and gave the assessment of left-sided myofascial pain of undetermined etiology, with a marked anxiety component.  He referred plaintiff to the Medical Symptom Reduction program.  Subsequently, Dr. Sandoval saw plaintiff and determined all fibromyalgia spots were positive, but he wanted to do a more complete work-up of plaintiff, including blood tests to rule out other conditions.  The blood tests were returned as normal, and the ALJ relied on this point to opine that the tests "support[] that his fibromyalgia was not severe."  Tr. 28.  In February of 2004, and again in July, Dr. Sandoval evaluated plaintiff and diagnosed him with cervical osteoarthritis, and did not mention fibromyalgia at all.  Dr.

Greenleaf examined plaintiff in July of 2004 and specifically noted that "the 18 classic tender points for fibromyalgia are all firmly palpated and virtually none of them are reported as being tender. This is done with both distraction and focused questioning as to whether each spot is tender." Tr. 506.

Plaintiff is correct that the ALJ improperly relied on the normal blood tests to find plaintiff's fibromyalgia not severe. See Benecke v. Barnhart, 379 F.3d 587, 590 (9th Cir. 2004) ("The disease is diagnosed entirely on the basis of patients' reports of pain and other symptoms. The American College of Rheumatology issued a set of agreed-upon diagnostic criteria in 1990, but to date there are no laboratory tests to confirm the diagnosis.").

Nevertheless, there is substantial evidence for the ALJ to determine that the medical evidence clearly established that Washburn did not have medically severe fibromyalgia. The ALJ noted that Dr. Harris never actually diagnosed fibromyalgia. Dr. Sandoval noted that his diagnosis of fibromyalgia was due to the fact that he could not "come up with any other disease that would explain his fatigue, insomnia, and diffuse arthralgias and myalgias with his negative workup." Tr. 500. Dr. Sandoval also appears to have changed his diagnosis from fibromyalgia to cervical osteoarthritis. Dr. Greenleaf examined plaintiff and concluded he did not suffer from fibromyalgia. The ALJ relied on Dr. Greenleaf's assessment in identifying plaintiff's RFC and plaintiff does not challenge the ALJ's reliance on Dr. Greenleaf's assessment. Finally, as the Commissioner notes, the ALJ concluded that plaintiff had multiple other severe impairments with some of the same symptoms as fibromyalgia, such as somatoform disorder, degenerative disc disease, tendonitis, and adjustment disorder. Plaintiff's RFC accounts for his credible

symptoms associated with these impairments.  In summary, the ALJ's finding that plaintiff's

fibromyalgia is non-severe is supported by substantial evidence in the record.

II.    <u>Whether Impairments Equal a Listed Impairment</u>

Plaintiff argues that his impairments equal Listings 12.04 or 12.07.

The listings set out at 20 CFR pt. 404, subpt. P, App. 1 are "descriptions of various

physical and mental illnesses and abnormalities, most of which are categorized by the body

system they affect."  <u>Sullivan v. Zebley</u>, 493 U.S. 521, 529-30 (1990).  For a claimant to show

that his impairment matches one of those listed, the impairment must meet all of the specified

medical criteria.  <u>Id.</u> at 530.

Alternatively, a claimant may show that his unlisted impairment, or combination of

impairments, is "equivalent" to a listed impairment, but to do so he must present medical

findings equal in severity to all the criteria for the one most similar listed impairment.  <u>Id.</u> at 531.

A finding of equivalence must be based on medical evidence only.  20 CFR §§ 404.1529(d)(3),

416.929(d)(3); <u>Lewis v. Apfel</u>, 236 F3d 503, 514 (9th Cir 2001).

If a claimant's impairment matches or is equivalent to a listed impairment, he is

presumed unable to work and is awarded benefits without a determination whether he can

actually perform prior work or other work.  <u>Zebley</u>, 493 U.S. at 532.  The claimant bears the

burden of proving that he has an impairment that meets or equals the criteria of an impairment

listed in Appendix 1 of the Commissioner's regulations.  <u>Burch v. Barnhart</u>, 400 F.3d 676, 683

(9th Cir. 2005).

Washburn argues that his combined impairments equal Listing 12.04 for Affective

Disorders or 12.07 for Somatoform Disorders.  Each requires that Washburn have medically

documented symptoms (referred to as the "A" criteria), and suffer from specific functional

limitations (referred to as the "B" criteria). Washburn argues that the ALJ himself found plaintiff

suffers from "severe" somatoform disorder and an adjustment disorder with depressed mood,

satisfying the "A" criteria. As for the functional limitations, plaintiff suggests his limitations are

equivalent to those in the "B" criteria, especially if the fatigue and pain of his fibromyalgia are

considered.

The Commissioner does not argue that plaintiff fails to meet the "A" criteria.

In order for plaintiff's impairment to *meet* a listing, he must show at least two of the

following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

Listing 12.04(B) and 12.07(B).

While it may be true, as plaintiff argues, that a moderate limitation in maintaining

concentration, persistence, *and* pace is equivalent to a marked difficulty in maintaining

concentration, persistence *or* pace, the ALJ found plaintiff has mild limitations in activities of

daily living and moderate difficulties in social functioning. Plaintiff points to nothing in the

record that would suggest he has limitations that are more severe than the ALJ found. Indeed,

the ALJ questioned the extent of plaintiff's symptoms, pointing to evidence that plaintiff worked

during his period of disability, was observed working on his car, and had a tan even though he

claimed he could not be in the sun. Plaintiff does not challenge this credibility determination.

As a result, the ALJ did not err in concluding that plaintiff's impairments do not meet or equal

one of the listed impairments.

Page 15 - OPINION AND ORDER

III.    <u>Whether Plaintiff's RFC Accounts for Plaintiff's Mental Impairments</u>

Plaintiff argues that his RFC does not reflect limitations as a result of his "severe" mental impairments. The ALJ found that plaintiff has moderate limitations in maintaining concentration, persistence and pace, but plaintiff's RFC describes his resulting functional limitation as an ability to "perform simple, routine tasks with simple instructions." Plaintiff claims the RFC does not capture the limitations associated with his mental impairments since he claims his severe mental impairments significantly interferes with his ability to understand, carry out and remember simple instructions.

Hypothetical questions posed to a vocational expert must specify all of the limitations and restrictions of the claimant. <u>DeLorme v. Sullivan</u>, 924 F.2d 841, 850 (9th Cir. 1991). If the hypothetical does not contain all of the claimant's limitations, the expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy. <u>Id.</u> There is no requirement that the words from the Psychiatric Review Technique Form must be used in the hypothetical. The ALJ included a limitation in the hypothetical that the person could perform only simple, routine tasks with simple instructions. Dr. Trueblood noted plaintiff could keep track of his bills, was pretty good with money, liked to cook, was capable of driving and using the telephone. Plaintiff's and his wife's testimony primarily related to plaintiff's physical problems. Accordingly, the limitation that plaintiff is able to perform "simple, routine tasks with simple instructions" is supported by substantial evidence in the record.

IV.    <u>Whether the ALJ Could Properly Rely on the VE Testimony</u>

Plaintiff raises several problems with the ALJ's reliance on the VE's testimony.

Plaintiff argues that the ALJ should have found plaintiff disabled under the Medical-Vocational Guidelines as a person closely approaching advanced age, with a high school education and no transferable skills. 20 C.F.R. § 404, Subpart P, Appendix 2. The Guidelines, however, do not apply in a situation where plaintiff can perform neither a full range of sedentary work nor a full range of light work, and where a claimant has nonexertional limitations in addition to exertional limitations. The ALJ properly consulted a VE, rather than relying on the Medical-Vocational Guidelines. Moore v. Apfel, 216 F.3d 864, 870 (9th Cir. 2000) (when claimant falls between two Guidelines, the ALJ should consult a VE); SSR 83-12 (when claimant falls between two grids, consultation with a VE is appropriate).

With regard to the ALJ's reliance on the VE's testimony, plaintiff first argues the VE's testimony was based on a hypothetical that is broader than plaintiff's RFC. Plaintiff's RFC limits him to changing position every 30 minutes, but the ALJ asked the VE to assume the hypothetical claimant with plaintiff's background could change positions every 30 to 60 minutes.

Plaintiff is correct that the hypothetical the ALJ posed to the VE was less restrictive than plaintiff's RFC and, as a result, the VE's testimony has no evidentiary value. Contrary to the Commissioner's argument, this is not harmless error. As plaintiff points out, the jobs the VE identified could require an employee to maintain one position for 60 minutes, before allowing a change of positions. Plaintiff needs the opportunity to change positions every 30 minutes. The VE needs to clarify whether the jobs she identified allow a person to change positions every 30 minutes.

In addition, plaintiff argues the ALJ wrongly concluded plaintiff could perform light work when his standing and walking limitations fall into the sedentary category. The three jobs

identified by the VE that a hypothetical claimant with plaintiff's background and limitations can perform are small products assembler, marking clerk, and automatic film developer, all of which are categorized as light work. However, the ALJ found plaintiff is limited to standing and/or walking two hours in an eight-hour day and, plaintiff argues, as a result he cannot perform "light work" as it is defined by the agency.

> Light work is defined to mean, in relevant part:
>
> [A] job is in this category when it requires a good deal of walking or standing–the primary difference between sedentary and most light jobs. A job is also in this category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work. . . . Relatively few unskilled light jobs are performed in a seated position. . . . [T]he full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday.

SSR 83-10. In contrast, sedentary work requires only occasional walking and standing, which is defined to mean about two hours in an eight-hour workday. Id.

It is clear plaintiff's limitations preclude him from performing the full range of light work, and his standing and walking limitations more closely resemble those needed for sedentary work. The classification of a job as "light" or "sedentary" in the DOT, however, provides only a presumption of what the job requires, which may be rebutted by "persuasive evidence." Johnson v. Shalala, 60 F.3d 1428, 1435 (9th Cir. 1995). There is no evidence in the record, persuasive or otherwise, to explain the basis for the VE's conclusion that a hypothetical claimant with plaintiff's limitations can perform three jobs categorized by the DOT as light work when he can only stand or walk two hours in an eight-hour day.

Furthermore, plaintiff alleges the DOT classifies all three jobs as requiring more concentration than plaintiff's RFC permits. He is limited to simple, routine tasks with simple

Page 18 - OPINION AND ORDER

instructions, but the small products assembler and automatic developer of photographs requires a GED Reasoning Level 2.  GED Reasoning Level 2 requires "commonsense understanding to carry out detailed but uninvolved written or oral instructions."  Dictionary of Occupational Titles, App. C (4th ed. 1991), *available at* 1991 WL 688702.  Plaintiff claims his RFC is closer to a GED Reasoning Level 1, which requires "commonsense understanding to carry out simple one- or two-step instructions."  Id.  I agree that, at least on its face, plaintiff's limitation seems to correspond to GED Reasoning Level 1.  The VE did not explain whether her testimony conflicted with the DOT or not.

In sum, the ALJ erred by not inquiring of the VE whether her testimony conflicted with the DOT.  The ALJ was required to ask about the conflicts and to obtain a "reasonable explanation" for the conflicts.  Massachi v. Astrue, 486 F.3d 1149, 1152-53 (9th Cir. 2007).  In addition, as I note above, the ALJ provided a hypothetical that was broader than plaintiff's RFC with respect to changing positions every 30 minutes.

Based on the above, the ALJ's conclusion that plaintiff could perform other work in the national economy is not supported by substantial evidence.

V.    Remand for Further Findings

The court has the discretion to remand the case for additional evidence and findings or to award benefits.  Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir. 1996).  The court should credit evidence and immediately award benefits if the ALJ failed to provide legally sufficient reasons for rejecting the evidence, there are no issues to be resolved before a determination of disability can be made, and it is clear from the record that the ALJ would be required to find the claimant disabled if the evidence is credited.  Id.  If this test is satisfied, remand for payment of benefits is

warranted regardless of whether the ALJ might have articulated a justification for rejecting the

evidence.  Harman v. Apfel, 211 F.3d 1172, 1178-79 (9th Cir.), cert. denied, 531 U.S. 1038

(2000).

The "crediting as true" doctrine resulting in an award of benefits is not mandatory in the

Ninth Circuit.  Connett v. Barnhart, 340 F.3d 871, 876 (9th Cir. 2003).  The court has the

flexibility to remand to allow the ALJ to make further determinations, including reconsidering

the credibility of the claimant.  Id.

Since the VE's testimony conflicts with the DOT without explanation, the ALJ's decision

is not supported by substantial evidence.  I remand for the ALJ to elicit a reasonable explanation

for the conflict between the VE's testimony and the occupational information supplied by the

DOT, and for the ALJ to take any additional testimony deemed necessary.

## CONCLUSION

The decision of the Commissioner is reversed.  This action is remanded to the

Commissioner under sentence four of 42 U.S.C. § 405(g) for rehearing to further develop the

record.  Judgment will be entered.

IT IS SO ORDERED.

Dated this _____18th_____ day of June, 2008.


                              __/s/ Garr M. King_____
                              Garr M. King
                              United States District Judge